**EDINBURG HOSPITAL AUTHORITY, d/b/a Edinburg General Hospital, Appellant,**

**v.**

**Shirley TREVINO and Oscar Trevino, Appellees.**

**No. 13–93–278–CV.**

Court of Appeals of Texas, Corpus Christi.

July 13, 1995.

Rehearing Overruled Aug. 10, 1995.

---

Charles Sweetman, Sweetman & Wise, Brownsville, Frank Sabo, Sweetman & Wise, Harlingen, C. Dean Davis, Robert L. Hargett, Davis & Davis, Austin, for appellant.

John David Franz, McAllen, Preston Henrichson, Edinburg, for appellees.

Before SEERDEN, C.J., and DORSEY and FEDERICO G. HINOJOSA, Jr., JJ.

## OPINION

DORSEY, Justice.

Shirley Trevino and her husband, Oscar Trevino, sued and recovered damages from Edinburg General Hospital for her negligent treatment at the hospital immediately prior to her delivery of their stillborn child. The principal issues presented are whether Shirley may recover for the emotional distress she suffered because of the loss of the child, whether Oscar may recover as a bystander to Shirley's injuries, and if so, whether his emotional distress from witnessing Shirley's suffering and the loss of their child is properly an element of his damages.

Shirley Trevino was admitted to Edinburg General on May 28, 1989, nine months pregnant. She had an uneventful pregnancy until her hospital admission when she came to the hospital complaining that her water broke the day before. After several hours in the hospital and administration of Pitocin, a drug to augment labor, she began to hemorrhage. She was taken to surgery; an emergency cesarean section was performed, but the baby was stillborn. Oscar was present with her that afternoon and evening until she was taken to surgery. He saw that his wife was hemorrhaging and was aware of the seriousness of her and the baby's condition when she was taken to surgery.

Shirley Trevino filed suit against the hospital and her attending physician, who settled before trial. Oscar intervened. Shirley claimed that appellant's negligent treatment of her during childbirth injured her and that her principal injury was the loss of her unborn child and accompanying emotional distress. Oscar claimed the negligent treatment of his wife which resulted in the death of their unborn child caused his emotional distress. The jury was charged on negligent acts of hospital employees involving use of tangible personal property. The jury found for the Trevinos, awarding each $750,000.

## CAUSES OF ACTION

By its first and third points of error, the hospital argues that neither Shirley nor Oscar have a valid cause of action that forms the basis for their recovery and that the trial court erred in denying the hospital's motions for instructed verdict and judgment non obstante veredicto. Point of error six is closely related, in that appellant complains that the damages awarded to the Trevinos are not recoverable as a matter of law.

Appellant makes two arguments under these points of error. The first is that there should be no award for emotional distress caused by the loss of a fetus when the mother sues for medical negligence practiced upon her because there is no cause of action for the death of a fetus. The second attacks the

propriety of the husband's cause of action as a bystander.

## 1. Shirley Trevino

■ There is no cause of action for the death of an unborn child under the Texas wrongful death or survival statues. *Krishnan v. Sepulveda,* 38 Tex.Sup.Ct.J. 806, 807, —— S.W.2d —— [1995 WL 358844] (June 15, 1995); *Witty v. American Gen. Capital Distrib., Inc.,* 727 S.W.2d 503 (Tex.1987). There can be no recovery to the parents for the loss of a fetus as a person or as a chattel. *Id.* For a cause of action to exist for prenatal injuries, the child must be born alive. *Yandell v. Delgado,* 471 S.W.2d 569, 570 (Tex. 1971) (per curiam). If the child dies after a live birth as a result of the prenatal injuries, a right of action exists under the wrongful death and survival statutes. *Leal v. C.C. Pitts Sand & Gravel, Inc.,* 419 S.W.2d 820, 821–22 (Tex.1967).

■ The Texas Supreme Court reaffirmed the rule of *Witty* in *Pietila v. Crites,* 851 S.W.2d 185, 186 (Tex.1993), holding that there is no cause of action for the negligent treatment of the fetus that results in its death and the emotional injury to its parents. However, in *Pietila* the court stated, "[b]ecause the Criteses did *not* claim that either physician improperly treated any of [the mother's] injuries, their claim fails as a matter of law." *Id.* at 186 (emphasis added). Most recently in *Krishnan,* 38 Tex.Sup.Ct.J. at 808, —— S.W.2d at ——, the court allowed the mother to recover mental anguish damages for injury to her own body in connection with a stillbirth.

That is the situation here. The plaintiff, Shirley Trevino, sued for her negligent treatment that resulted in injuries to her and not for the negligent treatment of her child resulting in its injuries. The evidence is that she was administered the drug Pitocin in excessive doses and for too long a time, which caused her to hemorrhage. Dr. Barnes, the plaintiffs' expert, testified that the initial dose was too high and within a few minutes after the Pitocin was administered, Trevino had a sustained contraction which was evidence of placental abruption. A placental abruption is a blood clot that forms between the uterine wall and the placenta making the uterus and abdominal wall very tender. An abruption can cause the death of the baby by separating the umbilical cord and may cause the mother's death by causing uncontrollable bleeding. We hold Shirley Trevino has a cause of action for the medical negligence practiced upon her.

■ Appellant hospital next complains that the damages awarded Shirley were for mental anguish and that her emotional distress was primarily over the loss of her child. The hospital argues, as there is no cause of action for the death of an unborn child, to allow damages for emotional distress because of the fetus's death is to reach through the back door what one cannot reach through the front. This argument confuses mental anguish as an element of damage with the notion of mental anguish as a separate claim. *See Crites,* 851 S.W.2d at 186. Mental anguish is a recognized element of damage caused by breach of some duty, in this case the duty of a hospital to treat a patient in conformity with the recognized standards for obstetrical care. *See Boyles v. Kerr,* 855 S.W.2d 593, 596–97 (Tex.1993).

■ A tortfeasor is responsible for all damages that are proximately caused by the injury inflicted. *See Brown v. Edwards Transfer Co.,* 764 S.W.2d 220, 223 (Tex.1988); *Commonwealth of Mass. v. Davis,* 140 Tex. 398, 168 S.W.2d 216, 222 (1942). Mental anguish includes mental sensations of pain resulting from such emotions as grief, severe disappointment, indignation, wounded pride, shame, despair or public humiliation. *Trevino v. Southwestern Bell Tel. Co.,* 582 S.W.2d 582, 582, 584 (Tex.Civ.App.—Corpus Christi 1979, no writ). Ordinarily, a plaintiff may recover all damages which naturally flow from the tortious act and is limited only to that injury which is "the natural and probable consequence of the wrongful act ..." *Commonwealth of Mass.,* 168 S.W.2d at 222. "All that is required is that the injury be of such a general character as might reasonably be anticipated and that the injured party be so situated with relation to the wrongful act that injury might reasonably have been foreseen." *Brown,* 764 S.W.2d at 224.

In this case, negligence during the delivery of a child which results in death of that child foreseeably causes mental anguish to the mother. That mental anguish includes the grief for loss of the child. Shirley is entitled to recover for the mental distress that was a natural consequence of the hospital's negligence. *See Krishnan*, 38 Tex.Sup.Ct.J. at 808, —— S.W.2d at ——; *Witty*, 727 S.W.2d at 506.

### 2. Oscar Trevino

■ Oscar Trevino's cause of action requires a different analysis. The duty of the hospital to Shirley was to use reasonable care under the circumstances in its treatment of her. Oscar predicates his theory of recovery on his status of bystander to Shirley's injuries. Texas recognizes a cause of action for mental distress for injuries to another only in limited circumstances. In *Freeman v. City of Pasadena*, 744 S.W.2d 923, 924 (Tex.1988), the Texas Supreme Court adopted the analysis and criteria developed by the California Supreme Court in *Dillon v. Legg*, 68 Cal.2d 728, 69 Cal.Rptr. 72, 88, 441 P.2d 912, 928 (1968), in examining whether a bystander has a cause of action for witnessing injuries caused another. A trial court considers three factors in determining whether the defendant should reasonably foresee the emotional injury to the bystander plaintiff: 1) whether the plaintiff was located near the scene of the accident; 2) whether the plaintiff's emotional shock results from the direct emotional impact upon the plaintiff from the sensory and contemporaneous observation of the accident; and 3) whether the plaintiff and the victim are closely related. *Freeman*, 744 S.W.2d at 924.

■ Oscar was in the hospital room with his wife from her admission at 2:30 p.m. until she was taken to emergency surgery around 8:30 that evening. Oscar, his mother, and Shirley's mother took turns staying with her over the six hour period. Oscar witnessed his wife's hemorrhaging after Pitocin was administered and the nurse's shocked reaction to the hemorrhaging. He described seeing "a bunch of blood and globs, blood globs. I don't know what it was. It looked like meat. I thought it was the baby. It was

coming out and falling into the [bed] pan." Shirley's doctor came into the room and examined her. When he finished his examination, there was more blood and more blood clots. Oscar testified that he thought his wife was going to die. As they took her to surgery, he said he feared that he would not see his wife or the baby again. He saw the baby before Shirley regained consciousness from the anesthesia and then saw Shirley in the recovery room.

A claim of a bystander in medical malpractice is unusual. The typical bystander action arises from an automobile collision or other tort in which the injuries are immediate and apparent. Most attempts by a plaintiff to qualify as a bystander in a medical malpractice context have been unsuccessful, primarily because there has been no sudden accident in which the results are immediately obvious.

In *Robinson v. Chiarello*, 806 S.W.2d 304, 309 (Tex.App.—Fort Worth 1991, writ denied), the claim was misdiagnosis and failure to monitor the patient's condition. The plaintiffs' suffering began when the patient's health began to fail, and they watched him worsen until his eventual death several days later. The medical events the plaintiffs' complained of occurred over an extended period of time. The *Robinson* court declined to recognize a bystander cause of action in a medical negligence case holding that there was no "accident" as contemplated in *Freeman*.

Similarly in *Cavanaugh v. Jones*, 863 S.W.2d 551, 556 (Tex.App.—Austin 1993, no writ), the acts of alleged medical negligence occurred from May to December 1988. They were principally the failure to properly diagnose and monitor the patient's condition and to provide transportation to the hospital. The patient, a child, died while plaintiffs were transporting her to a hospital by bus. The court observed that the plaintiffs could not have contemporaneously perceived the acts of negligent diagnosis and treatment, and because the acts of negligence were imperceptible, family members did not qualify as bystanders.

In the instant case, Oscar was in the room with his wife and observed the drug dripping

into her veins. The effects of Pitocin, although not instantaneous, occurred within minutes. Dr. Barnes testified that Pitocin was started at 5:45 and Shirley had a prolonged contraction within five minutes. A prolonged contraction is a sign of placental abruption. There were several sustained contractions over the next thirty minutes. The nurse noticed vaginal bleeding at 8:35 and notified the physician.

Oscar was present immediately before the doctor ordered emergency surgery and witnessed his wife's hemorrhaging. He heard the doctor call for a surgical team and observed the delay in taking his wife to surgery. Oscar saw her immediately after the cesarean section and held their dead child in his arms. We hold that under these facts Oscar may recover as a bystander to his wife's injuries; that is, the risk of harm to Oscar was reasonably foreseeable under the circumstances. Unlike *Krishnan*, 38 Tex. Sup.Ct.J. 809, —— S.W.2d ——, where the husband was denied recovery for emotional distress resulting from the stillbirth, Oscar's emotional distress resulted from the additional tangible physical injury to his wife. Points of error one and three are overruled.

By point six, appellant claims error in the trial court's denial of its Motion for Instructed Verdict, Motion for Judgment Notwithstanding the Verdict, Motion to Modify or Correct the Judgment and Motion for New Trial because the damages awarded by the jury are not recoverable as a matter of law. This point of error includes a no evidence complaint as to damages as well as a complaint of no evidence of a cause of action. We have previously determined that both Shirley and Oscar Trevino have cognizable causes of action. To that extent point six is overruled. The complaint of no evidence to support the jury's award of damages will be discussed with point of error seven.

## ADMISSION OF EVIDENCE

By point two, appellant complains of the admission of a series of photographs of the nursery the Trevinos prepared for the baby and certain testimony claimed to be improper.

Shirley Trevino testified that she carries a picture of the stillborn infant in her purse in response to the question, "What do you carry in your purse that reminds you of your baby?" Appellant objected to that testimony on the basis that it attempted to prove love, loss of society and companionship. Appellee withdrew the question and the court sustained the objection. Shirley was then asked: "We don't want to talk about loss of companionship or society or those things, just the mental pain and the pain you feel in your heart when you think about this baby? What do you have in your purse that causes you pain in your heart and anguish?" She answered, "I have his picture and I have the clipping of the funeral service." Appellant did not restate his objection. Nothing is presented for review.

The emotional distress the plaintiffs suffered flowed naturally from the loss of their unborn child. Evidence of their anticipation of the birth of their child and their emotional attachment to it was proper. Point two is overruled.

## THE CHARGE

Points four and five are closely related. Appellant contends by point four that Question No. 2 should not have been submitted to the jury because it permitted recovery for mental anguish for the loss of the fetus [1]. By point five appellant complains that the court improperly submitted Question No. 2 without appellant's requested instructions [2] because the question as submitted did not instruct the jury on the proper scope of damages.

---

1. Question No. 2:
 What sum of money, if paid now in cash, would fairly and reasonably compensate Shirley [Trevino] for the mental anguish, if any, that resulted from the loss of the fetus on the occasion in question?
 Question three asked the same for Oscar.

2. The requested instructions are:

Do not include any amount for any damages suffered by Shirley Trevino because of loss of love, comfort, companionship and society that would have been received from the expected newborn, had the expected newborn lived.
Do not include any amount for any damages suffered by Shirley Trevino because of the death of the fetus.

Similar instructions were requested for Question No. 3 as to Oscar Trevino.

■ The trial court is required to submit instructions and definitions as are proper to enable the jury to reach a verdict. TEX. R.CIV.P. 277. The charge contained no definition of mental anguish and no instruction on the proper elements of damage to be awarded.

■ The first part of appellant's requested instructions correctly excluded wrongful death damages, but the portion reading "Do not include any amount for any damages suffered by Shirley Trevino because of the death of the fetus" is not a correct limitation of damages.

The only element of damage submitted was mental anguish. Both Shirley's and Oscar's mental anguish necessarily include grief from the still birth of their child. *See Krishnan,* 38 Tex.Sup.Ct.J. at 808, —— S.W.2d at ——. Shirley's physical injury is indivisible from that grief, just as grief from loss of a limb is indivisible from the injury causing the loss.

■ To obtain reversal of a judgment on the court's failure to submit an instruction or definition, the requesting party must have tendered a substantially correct definition or instruction to the trial court. TEX.R.CIV.P. 278. If the requested instruction had been submitted to the jury, the jury would have been erroneously instructed not to consider the plaintiff's grief from the loss of the unborn child. The trial court did not abuse its discretion by rejecting appellant's instruction and in overruling its objection to Questions 2 and 3. Points four and five are overruled.

## SUFFICIENCY OF THE EVIDENCE

Appellant contends that there was either no evidence or insufficient evidence to support a claim for which liability is waived under the Texas Torts Claims Act. The Tort Claims Act provides a limited waiver of sovereign immunity for governmental units. TEX.CIV.PRAC. & REM.CODE ANN. Chap. 101 (Vernon 1986 & Supp.1994). A governmental unit is liable for "personal injury and death

so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." TEX.CIV.PRAC. & REM.CODE ANN. § 101.021(2) (Vernon 1986).

■ Appellant's complaint appears to encompass two theories: first, that there was no proof that the use of tangible personal property caused the injuries complained of and second, that the evidence of mental anguish is insufficient. We review appellant's no evidence complaint in the light most favorable to the verdict, considering only the evidence that supports the jury's finding. *Larson v. Cook Consultants, Inc.,* 690 S.W.2d 567, 568 (Tex.1985); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). In reviewing appellant's claim of factual insufficiency we consider all of the evidence. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965).

## 1. Use of Tangible Personal Property

■ For a governmental unit to be liable, there must be a causal relationship between the use of the tangible personal property and the injury sustained. *Salcedo v. El Paso Hospital Dist.,* 659 S.W.2d 30, 31 (Tex.1983). Appellees introduced evidence from their expert, Dr. A. David Barnes, that the nurse failed to properly read and interpret the fetal heart monitor. Dr. Barnes further opined that the nurse's administration of Pitocin pursuant to hospital policy was improper because the initial dosage was too high and the drug was not discontinued as soon as it should have been. Additionally, there was evidence that a significant delay occurred between the doctor's order for a surgical team and that team assembling in the operating room. Part of the delay was attributed to the use of the paging system to notify the hospital supervisor who was not actually reached for ten minutes after the initial request and page. Pitocin, the fetal heart monitor, and the paging system are all items of tangible personal property [3] which in

---

3. *Salcedo,* 659 S.W.2d at 32–33 (failure to properly interpret electrocardiogram graph is use of tangible property); *Texas Dep't of Corrections v.*

*Winters,* 765 S.W.2d 531, 532 (Tex.App.—Beaumont 1989, writ denied) (use of telephone system to send a telegram use of tangible personal prop-

their manner of use either caused the maternal distress and fetal demise or prevented the physician from saving the fetus's life once the distress was known. Oscar's injury arises from witnessing these deficiencies. The jury finding is supported by some evidence of use of tangible personal property.

Appellant presented competing evidence from its own expert physician that the drug was properly administered and the fetal heart monitor was correctly interpreted. This evidence does not disprove the use of the items of tangible personal property but disputes the causal relationship between the property and the injury. The evidence was conflicting and it was the jury's obligation to resolve that conflict. The evidence is factually sufficient to support the jury's finding.

## 2. Evidence of Mental Anguish

■ The evidence of Shirley's mental anguish came from her own testimony that although three years have passed since the stillbirth "[i]t still hurts me like it was yesterday." She carries a photograph of the baby in her purse as well as the clipping from the funeral service. She further stated that "her heart hurts." This evidence was uncontroverted.

Oscar Trevino and his mother, Estella, both testified about Oscar's response to the stillbirth of the child and witnessing the events at the hospital. While Shirley was still in the hospital, Estella testified that Oscar "was taking it very hard. He wouldn't eat. He would spend a lot of time crying like a baby, you know thinking about the baby." Afterwards, Oscar changed, "He started drinking a lot and started having, oh problems like drinking and like crying. . . . He was not the same person anymore." Oscar testified that while Shirley was in the operating room, he waited in the room by himself, that he was scared, he didn't know what was going to happen, and that he was crying. After the doctor told him that his son died, he continued to cry. Oscar testified that the

pain and the anger that he felt that day have continued to the present. He also testified that before the baby died, he was a social drinker and that afterwards he began to drink heavily in an attempt to block out the memory of that day. Oscar's testimony was uncontroverted.

The evidence is both legally and factually sufficient to support the jury's finding of mental anguish proximately caused by use of tangible personal property for both Shirley and Oscar Trevino. Points six and seven are overruled.

## TORT CLAIMS ACT

■ Next, appellant contends that appellees' claims for mental anguish are not bodily injury as contemplated by the Tort Claims Act. However, a number of courts have held that mental anguish is covered under the Tort Claims Act as bodily injury. *See City of Austin v. Davis*, 693 S.W.2d 31, 33 (Tex. App.—Austin 1985, writ ref'd n.r.e.) (father recovered mental anguish suffered as bystander for injury to child); *Genzer v. City of Mission*, 666 S.W.2d 116, 122 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.) (grandparents recovered mental anguish for bystander claims); *Mokry v. University of Tex. Health Science Ctr.*, 529 S.W.2d 802, 804–05 (Tex.Civ.App.—Dallas 1976, writ ref'd n.r.e.) (mental anguish arising out of hospital employees loss of patient's eyeball down the drain while washing it after surgical removal during preparation for laboratory exam valid claim under the Tort Claims Act); *see also Shade v. City of Dallas*, 819 S.W.2d 578, 582 (Tex.App.—Dallas 1991, no writ) (plaintiff who claimed mental anguish as result of City's negligent placement of sewer pipe which caused sewage to back up into his house stated a claim under the Tort Claims Act); *City of Watauga v. Taylor*, 752 S.W.2d 199, 204 (Tex.App.—Fort Worth 1988, no writ) (mental anguish arising from flooding caused by City's negligent maintenance of drainage ditch); *Parr Golf, Inc. v. City of Cedar Hill*, 718 S.W.2d 46, 47–48 (Tex.App.—

erty within contemplation of the Act); *Quinn v. Memorial Medical Ctr.*, 764 S.W.2d 915, 917 (Tex.App.—Corpus Christi 1989, no writ) (allegation that dispensing of a drug by a hospital pharmacy states a claim under Tort Claims Act);

*see also University of Tex. Medical Branch v. York*, 871 S.W.2d 175, 178–79 (Tex.1994); *Texas Dep't of Mental Health and Mental Retardation v. Petty*, 848 S.W.2d 680, 682 (Tex.1992).

Dallas 1986, no writ) (mental anguish arising out of maintenance of sewer personal injury within meaning of Tort Claims Act).

We hold that mental anguish and emotional distress caused by tortious activities of the sovereign, are bodily injuries and compensable under the Tort Claims Act. We overrule point eight.

By its ninth point of error appellant complains that the trial judge limited the amount of the Hospital's liability improperly; that is, the trial judge entered judgment for $250,000 per person against it rather than $100,000 as required by the Tort Claims Act.

 The Tort Claims Act in Section 101.023, "Limitation on Amount of Liability", provides various maximum amounts of liability for different government entities. TEX. CIV.PRAC. & REM.CODE ANN. § 101.023 (Vernon 1986). It has three categories: the State, "units of local government" except municipalities, and municipalities. Appellants argue that the trial court erroneously applied the limit for municipalities, when it should have used the lower limits applicable to "units of local government." The issue is whether the Edinburg Hospital Authority is a "unit of local government" or part of the city of Edinburg, such as an agency, division, commission or board.

 A municipality operating a hospital has long been considered to be protected by sovereign immunity for negligence in the hospital, because operating the hospital is a governmental activity of the city. *City of Dallas v. Smith*, 130 Tex. 225, 107 S.W.2d 872 (1937). Because the state has authorized cities to establish hospitals for the prevention and suppression of disease to benefit the public health, the state has ceded the city part of its police powers. *Id.*, 107 S.W.2d at 875. With the adoption of the Tort Claims Act in 1970, the State waived its immunity from suit in certain situations. The immunity of municipalities from suit when performing governmental activities, such as running hospitals, was also waived, if the tortious activity otherwise came within the Tort Claims Act.

The Edinburg Hospital is owned and operated by Edinburg Hospital Authority, appellant here. The Authority was created by the City in February 1982 in accordance with the provisions of the Hospital Authority Act[4]. The Act authorizes a city to create a hospital authority, and provides for the creating municipality to appoint the directors to run it. The municipality has continuing control over the authority; for instance, the hospital authority may be dissolved by the city and the hospitals operated by it may be sold or closed. TEX.HEALTH & SAFETY CODE ANN. § 262.005(a) (dissolution), 262.033(a)(1) (Vernon 1992) (sale of hospital).

Unlike a hospital district, a hospital authority has no taxing powers. *Compare* TEX. HEALTH & SAFETY CODE ANN. §§ 281.101 (Vernon 1992) (authorizing issuance of general revenue bonds by district), and 281.121 (granting taxing authority to retire bonds issued by the district), *with* §§ 262.021 (Vernon 1992) (taxing authority not among enumerated general powers of hospital authority) and 262.041 (authorizing issuance of revenue bonds). Municipal hospital authorities are considered municipal corporations in order to exercise their powers of eminent domain. TEX.HEALTH & SAFETY CODE ANN. § 262.028 (Vernon 1992). The enabling statute provides that a hospital authority may sue or be sued. *See* TEX.HEALTH & SAFETY CODE ANN. § 262.021(b)(2) Vernon 1992).

The status of hospital authorities for liability for their torts has been considered. In *Childs v. Greenville Hospital Authority*, 479 S.W.2d 399 (Tex.Civ.App.—Texarkana 1972 ref. n.r.e.), the court considered whether a hospital authority was performing a governmental or proprietary function, so as to be immune or not from its torts. The court analyzed the earlier cases which held a city operating a hospital was performing a governmental function, and held the authority was similarly immune for its torts. However, the only units of government whose oper-

---

**4.** Act of June 10, 1957, 55th Leg., R.S., ch. 472, 1957 TEX.GEN.LAWS 1380 (now codified as TEX. HEALTH & SAFETY CODE ANN. ch. 262 (Vernon 1992)).

ations are subject to the proprietary-governmental dichotomy and analysis are municipalities; all other governmental units authorized by the legislature are viewed to retain their immunity from suit unless the legislature specifically waives it. *See Bennett v. Brown County Water Imp. Dist. No. 1,* 153 Tex. 599, 272 S.W.2d 498 (1954), and cases cited therein. Hospital authorities are entitled to the protection of governmental immunity except as waived by the Tort Claims Act. *Huckabay v. Irving Hosp. Auth.,* 879 S.W.2d 64, 66 (Tex.App.—Dallas 1993, writ dism'd by agr.).

Typical units of local government are drainage districts, levee improvement districts, navigation districts, river authorities, junior college districts, school districts, and hospital districts among others. Tex.Civ. Prac. & Rem.Code Ann. § 101.001(2) (Vernon 1986). What these political subdivisions have in common is that they are special purpose entities with a specific, limited mission and a limited tax base that is committed to the performance of the specific function of the governmental unit.

A hospital authority is formed by the municipality, governed by directors appointed by that municipality, and subject to dissolution by the municipality. It has no ability to raise money through taxes. We hold that, for purposes of the Tort Claims Act, appellant Edinburg Hospital Authority is an extension of the municipality and is not a "unit of local government". We conclude that the $250,000 liability cap for municipalities should apply. *Contra Huckabay,* 879 S.W.2d at 64.[5] We overrule point nine.

■ Appellant also contends that the Tort Claims Act per person limit prevents joint recovery by Shirley and Oscar Trevino greater than the per person limit of $250,000. Appellant argues that Oscar's claim is derivative of the injury to Shirley's body and therefor only one person was injured. We disagree. Oscar's claim is a separate claim for his own individual mental anguish. *Davis,* 693 S.W.2d at 33; *see also Genzer,* 666 S.W.2d at 122. Point ten is overruled.

■ The Trevinos initially sued both the Hospital and the treating physician. The physician settled before trial. The Hospital was entitled to offset the settlement paid by the doctor against any award of damages. Tex.Civ.Prac. & Rem.Code Ann. § 33.014(a) (Vernon Supp.1995). The Hospital elected a dollar-for-dollar credit which the trial court applied to the damages awarded. The trial court then applied the Tort Claims Act limit of $250,000. Appellant contends that the trial court should have applied the Tort Claims Act limit first, then applied the credit. We disagree.

There are few cases dealing with the issue of when the credit is applied when there is also a cap on damages. *See State Dep't of Highways v. Cotner,* 826 S.W.2d 692, 693–94 (Tex.App.—Waco 1992), *rev'd on other grounds per curiam,* 845 S.W.2d 818 (Tex. 1993); *City of Houston v. Aber,* 770 S.W.2d 89, 90 (Tex.App.—Houston [14th Dist.] 1989, no writ); *contra City of Houston v. LeBlanc,* 562 S.W.2d 20, 22 (Tex.Civ.App.—Waco 1978, writ ref'd n.r.e.); *State Highway Dep't v. Pinner,* 531 S.W.2d 851, 858 (Tex.Civ.App.— Beaumont 1975, no writ).

We find the reasoning in *Aber* persuasive. In *Aber,* the plaintiff sued both an employee and the City. Before trial Aber settled with the employee for $100,000. The jury awarded damages of $187,258.89. The City argued that the Tort Claims Act liability cap should be applied first, reducing the award to $100,000 then they should be credited with the $100,000 and would owe Aber nothing. The court, reasoning that the Tort Claims Act should be construed liberally in favor of the claimant, applied the credit first and awarded Aber $87,258.89 against the City.

In *LeBlanc,* the plaintiff conceded the point on appeal and acceded to application of the credit after reduction of the damages to the Tort Claims Act limit. In *Pinner,* the court subtracted the credit from the Tort Claims Act Limit without discussion.

5. In *Huckabay,* the plaintiff argued that because hospitals are defined to be a governmental function of a municipality in the Tort Claims Act, a municipal hospital authority must be a municipality under the Texas Tort Claims Act. The court rejected that argument and in doing so concluded that municipal hospital authorities are units of local government.

We agree with the *Aber* court's application. Points ten and eleven are overruled as to application of the credit.

By reply point, appellees contend that the Tort Claims Act violates the equal protection clause of the Texas Constitution. They argue that there is no rational basis for the categories created in the 1987 revision to the Tort Claims Act and that there should be no difference in the treatment of similarly situated plaintiffs because one is treated in a municipal hospital and another is treated in a hospital operated by a municipal hospital authority. We need not address this point because of our disposition of point nine. TEX.R.APP.P. 90(a).

The JUDGMENT of the trial court is AFFIRMED.